**UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

| | |
|---|---|
| **LAURA BONDY,** | |
| Plaintiff, | |
| v. | Case No. 2:24-cv-02001 |
| **GLASS, LEWIS & CO., LLC,** | |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANT GLASS, LEWIS & CO., LLC'S MOTION TO DISMISS OR,**
<u>**IN THE ALTERNATIVE, TO STAY PROCEEDINGS AND COMPEL ARBITRATION**</u>

Plaintiff Laura Bondy, by and through the undersigned counsel, respectfully requests this Court to deny Defendant Glass, Lewis & Co.'s Motion to Stay Plaintiff's Claims and Compel Arbitration. For her opposition to said Motion, Plaintiff states the following:

**I.      NATURE OF MATTER & SUMMARY OF ARGUMENT**

This is an action for discrimination, harassment, and a hostile work environment based on sex pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 2000e, <u>et seq</u>. ("Title VII"). (Complaint, Doc. 1). Throughout her employment at Glass, Lewis & Co. ("Glass Lewis"), Plaintiff was subjected to unwelcome comments conduct and adverse actions and omissions based on her sex. (Id. at ¶¶ 12-80).

Defendant has now filed a Motion to Dismiss or, in the Alternative, to Stay Proceedings and Compel Arbitration (Doc. 6), along with a Memorandum in Support (Doc. 7) (collectively referred to as the "Motion"). Defendant claims that Plaintiff is bound by its arbitration agreement (the "Agreement") and, therefore, this Court should dismiss this matter or, in the alternative, stay proceedings and compel arbitration. However, Plaintiff's claim of discrimination, harassment, and a hostile work environment based on sex cannot be forced to arbitration because she elects to

1

proceed with that claim in this Court pursuant to the Ending Forced Arbitration Act.

## II.    FACTUAL BACKGROUND

Plaintiff is female (Complaint, Doc. 1, ¶ 12). Plaintiff has approximately 10 years of experience working in different management positions. (Id. at ¶ 13). In or about December 2018, Matt Seufert, a male, began his employment at Defendant Glass, Lewis & Co. LLC ("Glass Lewis") at its office at 2323 Grand Boulevard, Suite 1125, Kansas City, MO (the "Office") in a Manager, Client Services position. (Id. at ¶ 14).

In or about May 2019, Plaintiff graduated Magna Cum Laude from MidAmerica Nazarene University with a Bachelor of Arts Degree in Applied Organizational Leadership. (Id. at ¶ 15). In or about July 2019, Plaintiff began her employment with Defendant Glass Lewis at its office at 2323 Grand Boulevard, Suite 1125, Kansas City, MO 64108. (Id. at ¶ 16). Plaintiff started working at Glass Lewis in a Client Service Associate position. (Id. at ¶ 17).

That same day, Charlie Maybrier, a male, started working at Glass Lewis in a Client Services Associate position. (Id. at ¶ 18). Immediately preceding Mr. Maybrier starting in the Client Service Associate position, he had been employed in a temporary position at Glass Lewis in a different department. (Id. at ¶ 19).

Brendon McCarthy, who was in a Manager, Client Services position, was the onboarding manager and performed the onboarding process for Mr. Maybrier and Plaintiff. (Id. at ¶ 20). Mr. Seufert led one team of employees and Mr. McCarthy led another team of employees; however, the team operated together as a whole. (Id. at ¶ 21). Female employees reported Mr. McCarthy, a male manager, for subjecting them to discriminatory conduct based on sex. (Id. at ¶ 25). On one occasion, Mr. McCarthy initiated an inappropriate conversation about breastfeeding with a female employee under his supervision. (Id. at ¶ 26). On another occasion, Mr. McCarthy told a female

employee under his supervision that another female employee under his supervision was not going to be promoted but did not say why. (Id. at ¶ 27). On another occasion, Mr. McCarthy expressed harsh criticism to a female employee under his supervision about her lack of education and made jokes about it in front of co-workers. (Id. at ¶ 28). On another occasion, Mr. McCarthy had a conversation with a co-worker about the attractiveness of his wife and how a co-worker wanted to have sexual relations with her. (Id. at ¶ 29). Upon information and belief, Mr. McCarthy had been intoxicated while on the job on one or more occasions. (Id. at ¶ 30). Plaintiff did not feel comfortable being alone around Mr. McCarthy. (Id. at ¶ 31). At some point, Mr. McCarthy was removed from assisting with client accounts held by female employee(s) due to his discriminatory and/or inappropriate comment(s) and/or conduct based on sex. (Id. at ¶ 32).

In or about late 2021, Plaintiff was promoted to a Senior Client Service Manager position. (Id. at ¶ 33). Around the same time, Mr. Maybrier was promoted to a Senior Client Services Manager position. (Id. at ¶ 34). Plaintiff participated in and completed continuing education courses regarding management skills that were offered by Glass Lewis. (Id. at ¶ 35). In or about December 2021, Marguerite Pierce, the Director, Client Services, was promoted to Senior Director, Client Services. (Id. at ¶ 36). Plaintiff's overall performance at Glass Lewis for 2021 was rated as above expectations. (Id. at ¶ 37). In or about January 2022, Mr. Seufert was promoted to the Director, Client Services position. (Id. at ¶ 38). In or about early 2022, it became apparent that the workload of Plaintiff and female co-workers in similar positions was significantly larger than the workload of Mr. Maybrier and male co-workers in similar positions. (Id. at ¶ 39).

In or about July 2022, Mr. Maybrier was promoted again, this time to a Supervisor, Client Services position. (Id. at ¶ 40). Mr. Seufert set up a virtual meeting with Plaintiff. (Id. at ¶ 41). During the meeting, Plaintiff was working remotely from her home in Basehor, KS. (Id. at ¶ 42).

During the meeting, Mr. Seufert told Plaintiff that he did not want her to be upset. (Id. at ¶ 43). During the meeting, Mr. Seufert told Plaintiff that she was considered for the Supervisor, Client Services position. (Id. at ¶ 44). Prior to Mr. Maybrier's promotion, Plaintiff was not encouraged to apply for the Supervisor, Client Services job opening or otherwise made aware that the job was available. (Id. at ¶ 45). To Plaintiff's knowledge, prior to Mr. Maybrier's promotion, the Supervisor, Client Services job opening was not posted. (Id. at ¶ 46). To Plaintiff's knowledge, the Supervisor, Client Services position that Mr. Maybrier was promoted to was a new job that had been created. (Id. at ¶ 47). Upon information and belief, Mr. Maybrier was given the promotion to Supervisor, Client Services without being interviewed. (Id. at ¶ 48). During the meeting with Mr. Seufert, he told Plaintiff that he was glad she was interested in the Supervisor, Client Services position but indicated that she needed to do more work for the same pay. (Id. at ¶ 49).

On or about September 1, 2022, Plaintiff participated in another virtual meeting with Mr. Seufert. (Id. at ¶ 50). During the meeting, Plaintiff was working remotely from her home in Basehor, KS. (Id. at ¶ 51). During the meeting, Plaintiff notified Mr. Seufert that she had received an offer for a job at a different employer with higher compensation than that at her current position at Glass Lewis. (Id. at ¶ 52). During the meeting, Plaintiff told Mr. Seufert that she expected to be promoted if she was to continue employment at Glass Lewis. (Id. at ¶ 53). During the meeting, Mr. Seufert told Plaintiff that they were willing to match the compensation from the job offer that she had received from a different prospective employer. (Id. at ¶ 54).

In or about September 2022, Mr. Seufert informed Plaintiff that they were forming a training committee and asked her if she wanted to be a part of the committee. (Id. at ¶ 55). Mr. Seufert told Plaintiff that she was great at creating policies and procedures, documenting her work, and training new team members. (Id. at ¶ 56). Plaintiff indicated that she was interested in joining

4

the training committee. (Id. at ¶ 57). Mr. Seufert told Plaintiff he was glad she was interested in joining the training committee because it was "voluntold" – she was expected to join but with no additional pay. (Id. at ¶ 58). In or about late September 2022, Glass Lewis had neither increased Plaintiff's pay to match the compensation of the job offer from her other prospective employer or promoted her. (Id. at ¶ 59). Mr. Seufert told Plaintiff that her promotion was in the budget for the following year. (Id. at ¶ 60).

Plaintiff received less compensation than male co-workers in the same or similar position(s) with similar or less education and/or work experience. (Id. at ¶ 61). Defendant's adverse actions and/or comments and/or conduct based on sex resulted in working conditions that were so intolerable that a reasonable employee would feel forced to resign. (Id. at ¶ 62). Defendant intended to force Plaintiff to resign or reasonably foresaw or should have foreseen that its comments and/or conduct based on sex would force Plaintiff to resign. (Id. at ¶ 63).

On or about September 29, 2022, Plaintiff resigned from her employment at Defendant due to working conditions which she perceived to be intolerable, thereby resulting in her constructive discharge. (Id. at ¶ 64). During her exit interview, Plaintiff indicated to Glass Lewis that it could have done the following to prevent her from leaving: (1) provided higher pay and pay transparency, (2) provided opportunities for advancement, (3) provided a chance to cross-train and develop skills, and (4) addressed the unsustainable workload she was given (she was managing several clients who were previously managed by multiple co-workers in addition to several other large clients. (Id. at ¶ 65). Prior to her resignation from employment at Glass Lewis, Plaintiff's overall performance rating was always meets expectations or better. (Id. at ¶ 66).

Another female co-worker(s) resigned from employment at Glass Lewis around the same time as Plaintiff. (Id. at ¶ 67). Upon information and belief, after Plaintiff resigned and another

female co-worker resigned, about seven of their clients were reassigned or taken by a male co-worker. (Id. at ¶ 68). Defendant's acts of discrimination and harassment against Plaintiff comprise a series of interrelated events which constitute a continuing violation. (Id. at ¶ 69).

## III.    ISSUES

1.      Can Defendant compel Plaintiff's claim of discrimination, harassment, and a hostile work environment based on sex to arbitration as a matter of law following the enactment of the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, H.R. 4445 ("EFAA")?

2.      If the Court were to compel Plaintiff's claim to arbitration, is dismissing the pending action a proper remedy?

## IV.    ARGUMENT

Plaintiff does not dispute that she signed the Agreement at the outset of her employment at Glass Lewis. However, the EFAA authorizes Plaintiff to nullify any prior election to arbitrate her discrimination, harassment, and hostile work environment claim, and she should be permitted to proceed with her pursuit of that claim in this Court.

**A.      The Ending Forced Arbitration Act Authorizes Plaintiff to Elect to Proceed with Her Sex Discrimination, Harassment, and Hostile Work Environment Claim in this Court.**

**1.      The Ending Forced Arbitration Act.**

The EFAA, passed on March 3, 2022,[1] provides that "no predispute arbitration agreement . . . shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to [a] . . . sexual harassment dispute." 9 U.S.C. § 402(a). A "'sexual harassment

---

[1] Defendant cites a multitude of pre-EFAA cases to argue that arbitration is required because Plaintiff signed the Agreement. As explained in further detail, the EFAA renders the Agreement invalid and unenforceable.

dispute' means a dispute relating to conduct that is alleged to constitute sexual harassment." 9 U.S.C. § 401(3). Moreover, where a "case" includes a "claim" related to sexual harassment, the entire suit is exempt from arbitration "not merely the discrete claims in the case that themselves either alleged such harassment or related to a sexual harassment dispute." Johnson v. Everyrealm, Inc., 2023 WL 221673, at *18 (S.D.N.Y. Feb. 24, 2023). The sole exception is if the plaintiff—and only the plaintiff—"elect[s]" otherwise. 9 U.S.C. § 402(a). While parties can voluntarily elect to proceed to arbitration in these circumstances, the EFAA dictates that they cannot be compelled to do so.

Here, Plaintiff's lawsuit clearly meets this standard. She filed a lawsuit that accuses Defendant of violating Title VII by discriminating against, harassing, and subjecting her to a hostile work environment based on sex. As such, Defendant cannot force her to arbitrate.

To be sure, two courts have found that the EFAA applies only where the plaintiff's sexual harassment claim can survive a motion to dismiss. Johnson, 2023 WL 2216173 at *11; Delo v. Paul Taylor Dance Foundation, Inc., 2023 WL 4883337, at *5 (S.D.N.Y. Aug. 1, 2023). But these decisions ignore the plain language of the statute. Congress did not require a plaintiff to "plead" or "state" a claim for sexual harassment for the EFAA to apply. Rather, Congress carefully chose to invalidate forced arbitration for any case that is "filed" that "relates" to a sexual harassment dispute. 9 U.S.C. § 402(a). "The ordinary meaning of these words is a broad one – 'to stand in some relation; to have some bearing or concern; to pertain; refer; to bring in association with or connection with.'" Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383 (1992) (quoting Black's Law Dictionary 1158 (5th ed. 1979)). In other words, whether the complaint as "filed," 9 U.S.C. § 402(a), can survive a motion to dismiss (or some other motion) does not matter so long as the "dispute" among the parties has some connection to "conduct that is alleged to constitute

sexual harassment." 9 U.S.C. § 401(3).[2]

The EFAA delegates to courts, not arbitrators, the gatekeeping function to determine "the applicability of" the EFAA 'to an agreement to arbitrate and the validity and enforceability of an agreement to which [the EFAA] applies.'" 9 U.S.C. § 402(b). Nothing in this language suggests that a court has the authority to determine the merits—even at the pleading stage—of the sexual harassment claim. See Shukla v. Viacom Inc., 2019 WL 1932568, at *12 (S.D.N.Y. May 1, 2019) (under the FAA, courts are "strictly limited to determining arbitrability and enforcing agreements to arbitrate, leaving the merits of the claim and any defenses to the arbitrator") (quoting Republic of Nicaragua v. Standard Fruit Co., 937 F.2d 469, 478 (9th Cir. 1991)).[3] Here, Plaintiff's case unquestionably "relates to . . . [a] sexual harassment dispute." 9 U.S.C. § 402(a), and, therefore, Defendant's motion to compel arbitration should be denied.

### 2. This Case Relates to a Sexual Harassment Dispute, and the EFAA Applies.

Title VII's reference to "terms, conditions, or privileges of employment" is not limited to economic or tangible discrimination—it also includes a prohibition against requiring employees to work in a discriminatorily hostile or abusive environment. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)). To establish a prima facie case of hostile work environment under Title VII, plaintiff must show that: (1) she

---

[2] Congress chose "broadly worded," id. at 383 (quoting Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990)), and "deliberately expansive" language, id. (quoting Pilot Like Ins. Co. v. Dedaux, 481 U.S. 41, 47 (1987)) to exempt certain suits from arbitration. Accordingly, any doubt about the EFAA's reach should be resolved against forced arbitration.

[3] A different rule would be a major procedural innovation, created by judicial fiat. But Congress is presumed to legislate against the background of the Federal Rules, and surely if it meant to introduce such a novel procedure in favor of the proponents of arbitration, it would have clearly stated its intent to do so. See Califano v. Yamasaki, 442 U.S. 672, 700 (1979) ("We do not find in § 205(g) the necessary clear expression of congressional intent to exempt actions brought under that statute from the operation of the Federal Rules of Civil Procedure.")

is a member of a protected class; (2) the conduct in question was unwelcome; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) some basis exists for imputing liability to the employer. Rahn v. Junction City Foundry, Inc., 152 F.Supp.2d 1249, 1256 (D. Kan. 2001).

To constitute harassment actionable under Title VII, conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive. Morton v. Steven Ford-Mercury of Augusta, Inc., 162 F.Supp.2d 1228, 1238 (D. Kan. 2001). To prevail under a hostile work environment theory, plaintiff must show that sexually-oriented conduct had the purpose or effect of unreasonably interfering with her work performance or created an intimidating, hostile or offensive working environment. Rahn, 161 F.Supp.2d at 1233.

The Tenth Circuit has explained that "'[p]ervasiveness and severity are independent and equal grounds' upon which a plaintiff may establish this [second] element of a hostile environment claim." Tademy v. Union Pac. Corp., 614 F.3d 1132, 1144 (10th Cir. 2008) (alternation in original) (quoting Witt v. Roadway Express, 136 F.3d 1424, 1432 (10th Cir. 1998)). But, pervasiveness and severity "'are, to a certain degree inversely related; a sufficiently severe episode may occur as rarely as once ..., while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute.'" Id. (quoting Cerros v. Steel Techs., Inc., 288 F.3d 1040, 1047 (7th Cir. 2002)). Title VII prohibits conduct that is "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive[.]" Id.; see also Walker v. Answer Topeka, Inc., 2020 WL 4200878, at *4 (D. Kan. July 21, 2020). The Court must take into consideration steadily intensifying differential treatment by Plaintiff's supervisor(s) and overtly sexist conduct by Defendant. See Iweha v. Kansas, 2022 WL

9

1684697, at *6 (D. Kan. 2022).

An employer may be held liable for the continuation of harassment of which it had constructive knowledge but failed to stop. Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 673 (10th Cir. 1998). One way of showing constructive knowledge is to demonstrate the harassment was so pervasive that management-level employees should have recognized it. See id.

The court must view plaintiff's allegations—particularly at the pleading stage of the case—in their totality, drawing all inferences in plaintiff's favor. Mitchem v. Sleepcair, Inc., 2021 WL 4439406, at *6 (D. Kan. Sept. 28, 2021); see also Brooks, 985 F.3d at 1281 (explaining on a Rule 12(b)(6) motion to dismiss the court must view plaintiff's allegations "in the light most favorable to [her], and draw all reasonable inferences from the facts" in her favor (citation omitted)).

Here, viewing Plaintiff's allegations in their totality, as the Court must, Plaintiff alleges comments and conduct that are capable of supporting a plausible finding or inference of either severe or pervasive harassment based on sex. Plaintiff alleges that throughout her employment, Brendon McCarthy, a manager and one of her supervisors that she worked with frequently, initiated an inappropriate conversation about breastfeeding with a female co-worker under his supervision, (Complaint, ¶ 26), told a female co-worker under his supervision that another female co-worker under his supervision was not going to be promoted but did not say why, (Id. at ¶ 27), expressed harsh criticism to a female co-worker under his supervision about Plaintiff's lack of education and made jokes about it in front of co-workers, (Id. at ¶ 28), and had a conversation with a co-worker in the office about how attractive his wife was and how a co-worker wanted to have sexual relations with her. (Id. at ¶ 29). As a result of Mr. McCarthy's inappropriate and offensive remarks at work, Plaintiff did not feel comfortable being alone around Mr. McCarthy. (Id. at ¶ 31). Upon information and belief, Mr. McCarthy continued to work at Glass Lewis after Plaintiff

resigned from her employment there. In other words, Glass Lewis knew or should have known of manager Mr. McCarthy's inappropriate and offensive comments and conduct toward Plaintiff and other female co-workers whom she frequently worked and interacted with until she resigned but did nothing or very little to stop it or prevent it from reoccurring.

To further illustrate the hostile work environment based on sex that she was subjected to, Plaintiff alleges that in or about early 2022, she and female co-workers in the Senior Client Services Manager or similar positions were assigned significantly larger workloads than that of male co-worker in the Senior Client Services Manager or similar positions, including Charles Maybrier, (Id. at ¶ 39), in or about July 2022, Mr. Maybrier was promoted to a Supervisor, Client Services position in which the job was not posted and Plaintiff was not made aware of or interviewed for despite being as qualified as or more qualified than her male co-workers, (Id. at ¶¶ 13, 15, 40, 45-48, 61), Plaintiff was paid less than male co-workers in the same or similar positions with less job experience and/or less education, (Id. at ¶ 61), Plaintiff was told by manager and supervisor, Matt Seufert, that she needed to do more work for the same pay, (Id. at ¶ 49), on or about September 1, 2022, Mr. Seufert falsely represented to Plaintiff that Glass Lewis was willing to increase her compensation at Glass Lewis to match the job offer she had received from a different prospective employer, (Id. at ¶¶ 54, 59), later that month, Mr. Seufert indicated to Plaintiff that he was glad she was interested in joining a training committee because it was "voluntold" – she was expected to join but with no additional pay, (Id. at ¶¶ 55-58), and later that month, Mr. Seufert informed Plaintiff that her promotion was in the budget for the following year (Id. at ¶ 60). Defendant intended to force Plaintiff to resign or reasonably foresaw or should have foreseen that its comments and/or conduct based on sex would force Plaintiff to resign. (Id. at ¶ 63). On or about September 29, 2022, Plaintiff resigned from her employment at Defendant due to working

11

conditions which she perceived to be intolerable, thereby resulting in her constructive discharge. (Id. at ¶ 64).

In short, Defendant's differential treatment of Plaintiff and overtly sexist conduct toward her steadily intensified over the course of her employment and ultimately culminated in her resignation. Viewing these allegations in Plaintiff's favor, they plausibly allege a claim for sex discrimination, harassment, and hostile work environment.

### 3. Plaintiff's Claim Accrued After the Enactment of the EFAA, Requiring its Application.

The language of the EFAA, § 402(a), describes its applicability as effective immediately, to apply to any case filed after its enactment. As a result, the relevant date of the "claim or dispute" is, at latest, when the case itself was filed. Steinberg v. Capgemini Am., Inc., 2022 WL 3371323 (E.D. Pa. Aug. 16, 2022). The language of the EFAA should be interpreted to clarify that it is inapplicable to claims already filed in arbitration. Laura Farley, Ending Forced Arbitration: Understanding the New Federal Law that Prohibits Mandatory Arbitration in Matters of Sexual Assault or Harassment, (2022) 79 Bench & B. Minn 26, 29. Interpreting the statute as such is consistent with the legislative history of the EFAA. During debate, Congress clarified that the EFAA is retroactive "as to contracts currently signed," but not to "cases currently pending." Congressional Record—Senate, S628 (2/1/2022). Consistent with this notion, legislative debate highlighted the importance of the EFAA's retroactive impact. Id. For example, U.S. Sen. Charles Schumer noted that "[t]he good news about this legislation is all the clauses that people already signed in their employment contracts, even when they didn't know about it, will no longer be valid. So it not only affects the future but affects those who signed in the past." Id. Accordingly, to meet the purpose of the EFAA, courts must interpret it to apply retroactively to cases not yet filed in arbitration, to provide employees who have been subjected to sexual harassment and/or assault the

12

choice of how to pursue their claims.

Here, Plaintiff sets forth facts that demonstrate that the pattern and practice of sexual harassment and sex based discrimination and harassment against her spanned the entirety of her employment at Glass Lewis which ended in the fall of 2022 with her resignation. Because Plaintiff's claim includes allegations of sex-based harassment and a hostile work environment that extended into 2022 after the EFAA went into effect, and because the case as a whole relates to that dispute, the EFAA bars enforcement of the Agreement as to the entire case. See Molchanoff v. SOLV Energy, LLC, 2024 WL 899384, at *4-5 (S.D. Cal. March 1, 2024).

### i.   Plaintiff's claims accrued after the enactment of the EFAA under the continuing violation doctrine.

Even if this Court chooses not to hold the EFAA to apply retroactively, Plaintiff's claims accrued after the law's enactment under the continuing violation doctrine. Under the continuing violation doctrine, a claim accrues on the day of the last act in furtherance of the violation. Olivieri v. Stifel, Nicolaus & Co., Inc., 21-CV-0046 (JMA) (ARL) (E.D.N.Y. Mar. 31, 2023); see also Hauff v. State Univ. of New York, 425 F.Supp.3d. 116, 134 (E.D.N.Y. 2019 (a hostile work environment claims does "not accrue until the last act in furtherance of the allegedly discriminatory practice"). In the present case, Plaintiff's claim of sex discrimination, harassment, and hostile work environment did not accrue until she ultimately resigned on or about September 29, 2022, well after the EFAA went into effect.

### B.   If the Court Decides to Compel Arbitration, the Proper Remedy Is to Stay the Case Pending Arbitration, Not Dismiss the Case.

While § 3 of the Federal Arbitration Act requires the court to stay litigation when claims are properly referable to arbitration, it does not provide for dismissal of the case. Lazenby v. Balls Food Stores, Inc., 2005 WL 1521971, at *2 (D. Kan. 2005). § 3 of the Federal Arbitration Act

contemplates continuing supervision by the district court. <u>Meyer v. Dans un Jardin, S.A.</u>, 816 F.2d 533, 538–39 (10th Cir. 1987). Therefore, in the event the Court compels Plaintiff to arbitrate this case, the proper remedy is for the Court to stay this case pending arbitration, not to dismiss this case.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendant's Motion to Dismiss, or in the Alternative, to Stay Proceedings and Compel Arbitration.

**Murphy, Kinney, & Sumy, LLC**

 /s/ *Kyle E. Murphy*
Kyle E. Murphy #78836
406 W. 34th St., Suite 816
Kansas City, Missouri 64111
Phone: (816) 281-5470
Facsimile: (816) 866-7772
kyle@murphykinney.com
ATTORNEY FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 15, 2024 a copy of the foregoing was filed electronically via the Court's electronic filing system which will send a notice of electronic filing to the following counsel of record:

Daniel Boatright
Attorney for Defendant

 /s/ *Kyle E. Murphy*
Attorney for Plaintiff

14